UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **DARRELL SEMIEN ET AL** | CASE NO. 2:20-CV-01284 LEAD<br>Civil Action 2:22-213 MEMBER<br>Civil Action 2:22-1286 MEMBER |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **LABORATORY CORPORATION OF AMERICA ET AL** | **MAGISTRATE JUDGE LEBLANC** |

**TRIAL OPINION**

The Court presided over the bench trial of this matter from September 3, 2024, and until September 4, 2024. After the Plaintiffs' rested, the Government put on no defense witnesses, and/or witnesses, and the Court ordered post-trial briefs.

**Parties**

Plaintiffs include, Karla Semien, individual and on behalf of the minor child, MDS, and MDS as heir of the Estate of Darrell Semien, and Malachi Semien, individually and as heir of the Estate of Darrell Semien, and Madison Semien, individually, and as heir of the Estate of Darrell Semien, and LaQuanna Semien, Tyler Semien, and Corey Semien, are also heirs of the Estate of Darrell Semien.[1] Defendant is the United States.

**The Incident**

On August 21, 2019, Karla Semien took her ten-year old daughter, MDS, to the Southwest Louisiana Oberlin Clinic (the "Clinic") to obtain a doctor's note to allow her to

---

[1] First Supplemental And Amend Motion and

use the bathroom at school more frequently. MDS was treated at the Clinic by nurse practitioner Colleen Unkel for complaints of bladder incontinence.

After an examination, Unkel requested that MDS provide a urine sample. Practical After MDS placed the urine in a two-sided cabinet between the bathroom and the lab, Nurse Abby Walker collected the sample and performed a dipstick urinalysis on a urine specimen labeled MDS and August 21, 2019. The test showed there was a large amount of blood in the urine specimen, which prompted Nurse Unkel to send the labeled specimen to an outside lab--LabCorp. LabCorp's test results were consistent with the dipstick performed at the Clinic. LabCorp then performed additional testing, which revealed that Spermatozoa were present in the specimen. Due to MDS's age, LabCorp rechecked the specimen and confirmed the results.

LabCorp contacted Unkel at the Clinic and informed her of its results, which included the revelation of Spermatozoa. Unkel then called MDS's parents to come to the Clinic to discuss the results. After Unkel informed Mr. and Mrs. Semien of the results, as a mandatory reporter,[2] Unkel was bound to report suspected abuse of a minor. Mr. Semien, a sheriff's deputy, confirmed that he would report the issue to the local authorities.

After Mr. Semien reported the test results concerning MDS's urine specimen to the local authorities, an investigation ensued. It appears from the evidence that the authorities suspected that either Mr. Semien or MDS's brother, Malachi, were contributors of the

---

[2] La. Children's Code article 609, *et. seq.*

Page **2** of **20**

Spermatozoa. Unfortunately, it was later discovered that the urine specimen tested by the Clinic and LabCorp did not come from MDS. In fact, it came from a male.

## Claims

Plaintiffs are MDS and certain family members affected by the incident. Plaintiffs assert claims of negligence against the Clinic.[3] MDS seeks general damages for pain and suffering, past and future mental anguish, and past and future loss of enjoyment of life, as well as past and future medical expenses.[4] The Estate of Darrell Semien,[5] Mrs. Semien, and MDS's siblings Malachi and Madison seek general damages for loss of consortium, pain and suffering, mental anguish, as well as past and future medical expenses due to the negligence of the Clinic. Additionally, Plaintiffs seek judicial interest from the date of judicial demand and other general and specific relief.[6]

## Trial Testimony

*Karla Semien*

Mrs. Semien is the adoptive mother of MDS, Malachi, Madison, and Tyler Semien. Karla is the biological mother of Corey Semien and Darrel is the adoptive father of Corey Semien. Mrs. Semien was married to the now deceased, Darrell Semien. Mr. and Mrs. Semien were foster parents to approximately 70 children. They adopted Madison when she was two years old and MDS shortly after she was born. Malachi was adopted when he

---

[3] The Government here is the proper Defendant due to federal funding of the Clinic.
[4] Petition for Damages, ¶¶ 35, 36, Doc. 1-1.
[5] Mr. Semien is now deceased; he passed away on January 24, 2021. Affidavit of Karla Semien, ¶ 3, Doc. 79-4.
[6] Prayer, Doc. 1-1.

was six years old after having been placed in five other foster homes. During the time of this incident, the Semien family lived in Oberlin.

Malachi and MDS have the same birth-mom. Mrs. Semien testified that prior to the incident, both were very involved in sports and played sports together. Mrs. Semien also testified about MDS's participation in sports, specifically basketball. She was also involved with her family and school activities. She testified that MDS was outgoing and always going places.

Malachi loved sports, basketball, and football; he was always laughing and joking. Malachi played football since the day he came to live with the Semien's. Darrell and Malachi had a close father and son relationship; Mr. Semien was very protective of the children. Malachi, Madison, and MDS had a close relationship and always protected each other. The family enjoyed going to each other's sports games, having bar-b-ques and participating in family events.

Darrell was a police officer in Reeves, and an officer in the Allen Parish Police Office.

Ms. Semien testified that every year she would take Madison to the Clinic due to her overactive bladder so she could go to the restroom more frequently. On August 21, 2019, Ms. Semien had not yet obtained the requisite note for school. MDS had a bladder accident at school, which prompted Ms. Semien to take her to the Clinic on August 21, 2019. The nurses requested that MDS give a urine sample, which she provided herself.

Mrs. Semien was informed by Colleen Unkel that there was blood in MDS's urine, which would require further testing at another lab.[7] Mrs. Semien and MDS went home, and the next day, a nurse from the Clinic called and requested that the Mr. and Mrs. Semien return to the Clinic to discuss the lab results. Mr. and Mrs. Semien went to the Clinic and Unkel informed them that the urine specimen revealed large amounts of Spermatozoa in MDS's urine specimen. Nurse Unkel discussed with Mr. and Mrs. Semien that the results indicated that MDS had been raped.

Mr. and Mrs. Semien picked MDS up from school and took her home and discussed with MDS about sex and inquired if she had been sexually assaulted, to which, she denied and asked to take another urine sample. The next day MDS gave another urine sample with the help of her mother who noted that when she turned over the sample, the cup had not writing on it. That particular sample come back normal, with no blood and no Spermatozoa. In other words, entirely inconsistent with the previous urine specimen results.

Unkel explained that due to the inconsistent results, the rape must have occurred five days earlier. The Semiens reported the incident to the proper authorities. Mrs. Semien reported to the authorities the Semiens' daily activities that included the entire family for the previous five days. In her report to the police, she stated that there were two short periods of time that MDS was alone with Malachi. Other than Malachi, MDS was not alone with anyone else during that five-day period. Based on this information, the police

---

[7] Mrs. Semien testified that she knew Unkel personally prior to the incident and that her children had provided dog-sitting services for Unkel.

demanded that Malachi not stay at the house during the investigation. Malachi went to a friend's house and stayed during the investigation. The authorities repeatedly accused Malachi of raping MDS. Malachi adamantly denied the allegation.

Mr. and Mrs. Semien did not believe that Malachi raped his sister, but they believed the evidence that they were being shown revealed that he had raped MDS.

MDS did not understand what was going on and denied that Malachi did anything to her. Mr. and Mrs. Semien informed her that the evidence showed that Malachi had raped her. Mr. and Mrs. Semien testified as to the pain she and her husband suffered as a result of the incident and of their mistaken belief that Malachi had committed the alleged rape.

MDS was taken to a counseling center in Lake Charles where she was questioned by a counselor without her parents being present. MDS was interrogated about the incident and informed of detailed sexual situations. The counselors also informed MDS that due to trauma, she could not remember the rape. She again denied that she had been raped and that MDS was not the perpetrator. Despite her protests, no one believed MDS.

On August 23, 2019, Malachi went to the police station to be questioned. Malachi, as a football player, had to miss his Friday night football game. At age 16, Malachi was accused of rape, and living in the small community, rumors were rampant about the alleged rape and Malachi's alleged involvement. Mrs. Semien discussed the consequences of the rape and how she and Mr. Semien internalized the guilt for not protecting their adopted family, their wrongful accusations against Malachi, and not believing MDS.

Mrs. Semien testified that the authorities told Madison that she could not have any contact with Malachi. Madison had no knowledge of any misconduct of Malachi.

Malachi gave DNA samples to the authorities, and on September 5, 2019, MDS was taken to Dr. Bergstedt, an OBGYN to be examined. Dr. Bergstedt concluded that MDS had not been raped. The police were at Dr. Bergstedt's office and immediately learned the results of the examination.

Malachi's DNA sample result came back which conclusively showed that Malachi had not raped MDS. Furthermore, the first urine sample that was tested did not belong to MDS, but in fact, that urine sample belonged to a male. The Semiens then had to discuss with MDS all of the mistakes and errors that were made, including their own. Mrs. Semien testified that now MDS has a great distrust for doctors and/or medical providers, she is withdrawn and no longer participates in social activities.

MDS quit basketball and Mrs. Semien had to take her out of school due to panic attacks. Mrs. Semien allowed MDS to complete her schoolwork through virtual technology and testified that MDS's anxiety does not allow her to be outside of her presence. MDS no longer attends or participates in parties, or visits with family and friends.

Mrs. Semien testified that Malachi does not go anywhere and is no longer the "life of the party" and he gave up on football. Malachi informed his mom that he just wanted to move out of the country to get away from everybody. Malachi and Darrell's relationship was fractured, and they were not close anymore. Darrell tried to rebuild that relationship, but unfortunately passed away before he and Malachi were able to reconcile.

Mrs. Semien testified as to the hardship the incident had on Madison and her state of depression because she saw and lived with everything that happened.

Mrs. Semien testified that despite their being happy that MDS had not been raped, she and Mr. Semien again internalized their guilt for not believing both Malachi and MDS.

The family has been and continues to treat and counsel with Mr. Davis Woodward. Mrs. Semien intends to continue to treat with Mr. Woodward. Mrs. Semien testified that life has been hard and is akin to a nightmare that does not go away. She does not know how she is going to teach her children how to trust the law and test results especially since she is parenting alone since her husband passed away.

*Dr. Scott Bergstedt*

Dr. Bergstedt is a physician in obstetrics and gynecology. Dr. Bergstedt started doing child sexual abuse exams in 1997 and does approximately 25 to 30 exams a year. He was accepted by the Court as an expert in obstetrics, gynecology, and forensic examinations of children in sexual cases. Dr. Bergstedt testified that it is uncommon to have large amounts of sperm in a female's urine samples.

Dr. Bergstedt performed a pelvic exam for sexual assault on MDS on September 5, 2019. He testified that he found a normal pelvis and hymen, and no abnormal findings. He also found that it was not possible for the blood to be in MDS's urine sample. Dr. Bergstedt testified that more probable than not, MDS's August 21, 2019, urine specimen contained no blood and she had not been sexual assaulted.

*Colleen Unkel*

Unkel was the Nurse Practitioner that worked for SWLA on August 21, 2019, and who first treated MDS at the Clinic. Unkel performed a routine physical exam and found

no abnormalities or red flags to suggest that MDS might have been abused. Unkel ordered a urinalysis for MDS.

The Clinic's policy handling specimens requires that after the urine sample is collected, the sample cup is then labeled with two identifiers. Unkel testified that the urine sample cup was labeled[8] and then given to MDS to obtain the urine sample. All urine samples collected are placed in the same window. After the sample is placed in the window, Nurse Abbey Walker will collect the cup from the window and conduct the analysis. Unkel testified that Walker handled the urine sample collected from MDS.

Unkel spoke with Mrs. Semien and informed her that the urine specimen showed a large amount of blood; the following day the outside lab (LabCorp) informed Unkel that the urine sample contained a large amount of blood and sperm. Unkel directed one of the nurses to call Mr. and Mrs. Semien to return to the lab. When they returned, Unkel informed Mr. and Mrs. Semien of the lab results, and advised them that MDS may have been molested.

Mrs. Semien and MDS came back to the Clinic. Unkel preformed a partial exam on MDS but there was no sign of physical trauma. Unkel also had MDS provide another urine sample and she performed a dipstick analysis, which showed no amounts of blood in the urine specimen. Unkel testified that she made no record of collecting and analyzing the second urine sample provided by MDS, but she intended to document it later, but failed to do so.

---

[8] With name or initials and date of birth.

Unkel was unable to explain certain record keeping errors noted by counsel for Plaintiff. The chart records for August 21, 2019, showed that there were four male patients that visited the clinic on that date but in her deposition, Unkel testified that she only knew of one patient that visited the clinic on August 21, 2019. Unkel testified that the other earlier identified male patient did not provide a urine sample. Unkel gave Mr. and Mrs. Semien the option of notifying the authorities, otherwise, she would have to report it.

Unkel does not recall an instance where a urine sample has been mislabeled and that it followed the proper rules and regulations with regard to MDS's urine sample. Unkel also testified that the Clinic collected no other urine samples on August 21, 2019. Unkel testified that the urine sample specimen on August 21, 2019, tested by the Clinic, had the same results as the August 21, 2019, urine sample specimen analyzed by LabCorp.

*Monica Quaal*

Ms. Quaal works as the Southwest Louisiana Crime Lab and is accepted by the Court as an expert in forensics, DNA and serology. She worked at the Crime Lab on August 21, 2019. In that investigation, Quaal was asked to determine whose semen was included in MDS's August 21, 2019, urine specimen. Quaal's results conclusively excluded Malachi as a contributor of the Semen found in the first tested urine specimen. Quaal also determined that the August 21, 2019, urine specimen came from a male, not from MDS—a female.

*Abby Walker*

Walker worked as an LPN at the Clinic on August 21, 2019, when Mrs. Semien brought MDS to the Clinic. Walker collected and tested MDS's urine sample, and Walker

logged and labeled MDS's urine sample cup. Walker testified that she had no reason to dispute that there was a male patient at the Clinic at the same time as MDS.

Walker testified that it was possible, but not likely, that a male urine sample was collected and not documented, and it was also possible that a previous day's urine sample could have been picked up by the courier on August 21, 2019. Walker could not explain how a male's urine sample was swapped with MDS's sample. The Court again notes that the LabCorp sample yielded the same analysis as the sample Unkel tested with a dipstick from MDS on August 21, 2019, meaning that any mix-up in the urine sample happened prior to the courier picking the sample up for transport to LabCorp.

Walker reviewed all the patient charts for August 21, 2019, and determined that the only other patient that gave a urine sample on that day was a female diabetic, and no male urine samples were collected on that day.

*Dr. James J. Jancuska*

Dr. Jancuska is a urologist who diagnosed Darrell Semien with prostate cancer in 2012. He was accepted by the Court as an expert in urology.

Dr. Jancuska reviewed Mr. Semien's medical records and concluded that he had a radical prostatectomy in 2013. That procedure required that the prostate be removed, which removed Mr. Semien's ability to ejaculate. Dr. Jancuska testified that it would be impossible for Mr. Semien's sperm to be in MDS's urine sample.

*Sheila Laird*

Laird is a detective for the Allen Parish Sheriff's Office and investigates sexual assaults. Laird investigated the incident involving MDS. Laird was also a co-worker of

Darrell Semien. She discussed the investigation with Mr. and Mrs. Semien and observed that they were distraught with concerns about the incident.

Laird testified that MDS repeatedly denied all accusations against Malachi. She also stated that the Semiens were required to remove Malachi from the home during the investigation. Malachi denied all accusations during the interviews with the authorities and the Child Advocacy Center. Laird testified that Madison was also interviewed by the Child Advocacy Center and denied any knowledge of sexual activity in the home.

Malachi was charged with aggravated rape that carried a minimum of 25 years of imprisonment to life.  Louisiana Revised Statute 14:42. It also appeared that he was threatened by the authorities with the death penalty.

Laird also observed the examination of MDS by Dr. Bergstedt and observed that she was terrified during the exam. Laird testified that it was also difficult for Darrell Semien because of his affiliation with the Sheriff's department. Laird was aware that the Semien family had to move to another town due to the incident and the rumors that were being spread about the family, and Malachi. Laird testified that she ultimately closed the case.

*MDS Semien*

MDS currently lives with her mom. She testified that before the incident, she and her siblings was closely bonded, always doing things together with the family and friends and that they attended church on Sundays.

 MDS testified about the facts orbiting the incident.  MDS did not see if anything was written on the August 21, 2019, urine sample cup.  She recalled that her parents informed her that the Clinic found something in her urine that was not good.  MDS

demanded that she be able to take a second urine sample because she knew that what they were accusing Malachi of, was not true.

During all exams, tests, interviews, ect., MDS repeatedly denied that Malachi had sexually assaulted her. She also testified that she learned of her adoption only because of this incident. She testified that after the incident, her siblings started distancing themselves from each other and that she now exhibits separation anxiety. MDS has been seeing Mr. Woodward and will continue seeing him once a month. She now has a service dog that is continually with her.

MDS testified that because of her anxiety, she had to repeatedly call her mother to pick her up from school. Consequently, she quit going to school and is now homeschooled. MDS testified that her father passed away and that she never got any closure about her parents not believing her or her brother. MDS testified that she currently takes anxiety medication and sleep medicine.

*Malachi Semien*

Malachi lives in Lake Charles and works as a pool attendant at a casino in town. He was adopted when he was six years old after having been in many different foster homes. After being adopted, he explained that he experienced a very loving home, with a lot of family interaction and involvement. He also testified as to the close relationship he had with his parents and siblings.

Malachi testified that on August 21, 2019, while Malachi was at school in science class, he was called in to the office to be checked out by his Dad. Mr. Semien put Malachi in the back of his police car and informed Malachi that something had happened with MDS.

At that time, Malachi did not know what was going on, but his father advised him to "tell the truth."

Malachi observed his Dad as being mad and aggressive as he escorted Malachi to the Sheriff's office to be interrogated. Malachi was then interrogated by Matt Hebert, a detective with the Sheriff's office. Hebert inquired as to what Malachi had been doing for the past three or four days. Hebert informed Malachi that MDS had been raped. Hebert accused Malachi of the rape and repeatedly called him a liar. Malachi could not persuade the Hebert of any other officials that he was innocent.

Malachi explained his feelings of hopelessness and grief, about his father's presence during the interrogation. Malachi voluntarily gave a DNA sample during the interview process. After the interview, Malachi was not able to go home or speak with his sisters. He testified that he felt alone, betrayed, helpless, and that his parents were not there for him. A couple of years later, Mr. Semien passed away, and despite their efforts, Malachi felt that they were unable to restore their relationship to what it was before the incident.

Malachi testified that he believed people looked at him differently, including people at school. Malachi stated that he excelled in sports and was very popular, but after the incident, everything changed, and he believed people's perception of him had changed; he felt like they were always talking about him behind his back. Malachi testified that after the incident, he became a loner.

Malachi stated that he started going to a counselor, Dr. Lawrence Dilks. Malachi told Dr. Dilks that he was experiencing anger, frustration, embarrassment, rage and shame. He further explained that he had racing thoughts of something about to happen, and that he

was a target. Malachi was initially prescribed medication to help him and is no longer taking any medication but is continuing with the counseling. He went to approximately five (5) consultations from 2019 until his father passed away. He discussed his father's death with his counselors, Dr. Johnson. Malachi stopped seeing Dr. Johnson in 2022 but continued with family counseling.

Malachi remarked that he no longer had the same relationship with his mother, MDS, and Madison, and that after the incident he started staying away from home more. Malachi stated that he learned he was not being charged when he was living at his friend's house, which was approximately a month to one-and-a-half after the incident happened.

*Madison Semien*

Madison is Mrs. Semien's adopted daughter. She currently lives in Lake Charles and works at Lake Area Adventure as a manager, and swim instructor. Madison testified as to the positive home environment she experienced while growing up. She explained her close relation with MDS and Malachi.

Madison testified about the change in the home environment after the incident. Mrs. Semien explained the circumstances to Madison, and that Malachi would be moving out due to the rape allegations against him. Madison internalized a feeling of guilt, failure, and loneliness.

Madison explained that the allegations against Malachi broke her father, and caused Malachi to be an empty shell, full of anger. She felt like she had lost her Dad even before he passed away. Madison is currently in treatment with her family. Madison also witnessed a change in MDS after the incident, and testified that MDS stopped all outside activities

and sports.  She also witnessed MDS's panic attacks at school. Madison testified that MDS was losing hair due to the stress, she had no friends outside the home, and could not be away from her mom. Madison testified that her mom had to quit work because she had to continually pick MDS up from school.

*Davis Woodward*

Mr. Woodward is a licensed professional counselor and is employed at Elite Medical Wellness. Mr. Woodward was accepted by the Court as an expert in the field of licensed professional counselor and supervisor. Mr. Woodward testified as to the brokenness of the family and attributes it to the incident. Mr. Woodward reviewed the family's records from Dr. Dilks and agreed that his own diagnosis is consistent with Dr. Dilks' diagnoses.  Mr. Woodward had seen the family forty-three times and two nurse practitioners (Henry Johnson and Lakyn Patin) had also treated the family.

Mr. Woodward explained MDS's traumatic psychological condition, that he believes will continue throughout her life. Mr. Woodward confirmed that MDS was on medication for her condition and that she has separation anxiety. He also expressed that he believed it was better for MDS to not attend school but be homeschooled and have an emotional support animal.

Mr. Woodward commented that he treated the family after Mr. Semien passed away, which was an "insult to injury" to the rest of the family. He confirmed that he believed Malachi had not been able to reconcile his relationship with his father.  Mr. Woodward explained the effects the incident had on the family; he also testified about the subsequent passing of Mr. Semien and the detrimental effect that had on Mrs. Semien as the mom and

caretaker, and her sole responsibility to hold the family together. He also explained the effects the incident had on Malachi and confirmed he had seen Malachi for counseling. Mr. Woodward explained that Madison was also affected by the incident, and described the struggles she is dealing with. Mr. Woodward testified that the family would benefit with future treatment and opined that the Mrs. Semien, Malachi, and MDS would need to continue treatment for several years.

Mr. Woodward testified that the last time he counseled with Malachi individually, was March 29, 2022.

### Exhibits

See Exhibit List, Doc. 127.

### Findings of Fact and Law

Under the Louisiana Medical Malpractice Act, a medical malpractice claimant must establish by a preponderance of the evidence: (1) the defendant's standard of care; (2) the defendant breached that standard of care; and (3) a causal connection between the breach and the claimant's injuries. Louisiana Revised Statute 9:2794(A); *Squyres v. Our Lady of Lourdes Regional Medical Center, Inc.*, 954 So.2d 897 (La. App. 3 Cir. 4/4/07).

Defendant argues that Plaintiffs have failed to introduce the necessary expert testimony regarding the standard of care. Though expert testimony is typically required to establish the standard of care and breach elements in a malpractice action in most circumstances, expert testimony is not required when the healthcare provider does an obviously careless act. *Pfiffner v. Correa,* 643 So.2d 1228, 1233-34 (La. 10/17/94).

As noted by counsel for Plaintiffs, the Governments did not call any witnesses, but relied solely on its cross-examinations of Plaintiffs' numerous witnesses.

Here, it is abundantly clear that the Clinic mislabeled a urine specimen. That is obvious. The Clinic had a duty to properly label all specimens. Considering the evidence and testimony at trial, the Court finds that Plaintiff have proved by a preponderance of the evidence that the Clinic breached its standard of care in its handling of the urine specimen/sample. The Court further finds that Plaintiffs' have proved by a preponderance of the evidence that the Clinic's breach of the standard of care in handling the urine samples was the cause of MDS's and her family's injuries and damages.

## Damages

The Court finds that Plaintiffs' and their other witnesses' testimony was credible. The Court finds that the incident dramatically disrupted Plaintiffs' lives and familial relationships. Additionally, their post-incident lives were and continue to be harmfully and adversely affected.

The evidence and testimony reveal that Malachi suffered emotional trauma and mental anguish from being wrongfully accused by his family and the police for allegedly raping his sister due to the Clinic's negligence. He was wrongfully accused, harshly interrogated, threatened, labeled, shunned, and shamed. The Court finds that Malachi is entitled to an award for past medical bills in the amount of $3,000.00[9] and for pain and suffering, and mental anguish damages in the amount of $150,000.00.

---

[9] Plaintiffs' exhibit P-27, Doc. 127-26; the Court has deducted $100 for a "no show" fee.

The Court finds that Madison suffered mental anguish by the disruption of her familial relationships and is entitled to an award in the amount of $20,000.00.

The evidence and testimony reveal that Mrs. Semien suffered and continues to suffer mental anguish and loss of consortium because of the disruption of her familial relationships and is entitled to an award of $90,000.00. She is also entitled to an award of $11,625.00 for past medical bills.[10]

The evidence and testimony reveal that Mr. Semien suffered mental anguish and loss of consortium for the disruption of his familial relationships and therefore the Estate of Darrell Semien is entitled to an award of $90,000.00. Also, the Estate of Darrell Semien is entitled to an award of $3,000.00 for past medical bills.[11]

The evidence and testimony reveal that MDS suffered severe mental anguish and trauma, post-traumatic stress disorder, and separation anxiety. The Court finds that MDS is entitled to an award of $150,000.00 for pain and suffering, and past and future mental anguish. She is also entitled to an award of $9,815.00 for past medical bills.[12]

The Government contends that all of Plaintiffs' damages claim are capped at $500,000 based on the limitations expressed in the Medical Malpractice Act. Plaintiffs argue otherwise and assert that the $500,000 statutory cap applies only to MDS's claim because she was the patient. Because the Court has not reached the $500,000.00 statutory cap for general damages, that issue need not be addressed.

---

[10] Plaintiffs' exhibit P-26, Doc 127-25.
[11] Plaintiffs' exhibit P-28, Doc. 127-27; the Court has deducted $300 for a "no show" fee.
[12] Plaintiffs' exhibit P-23, Doc. 127-24; the Court has deducted $150 for a "no show" fee.

## Conclusion

Finding that Plaintiffs have proved by a preponderance of the evidence that the Clinic was negligent in its handling of the urine specimen, and that Plaintiffs have suffered damages as a result thereof, the Court will enter judgment against Defendant, the United States and in favor of Plaintiffs, the Estate of Darrell Semien, Karla Semien, Malachi Semien, MDS, and Madison Semien as follows:

Estate of Darrell Semien
General damages $ 90,000.00
past medical expenses $ 3,000.00

Karla Semien
General damages $ 90,000.00
Past medical expenses $ 11,625.00

Madison Semien
General damages $ 20,000.00

Malachi Semien
General damages $150,000.00
Past medical expenses $ 3,000.00

MDS Semien
General damages $150,000.00
Past medical expenses $ 9,815.00

**THUS DONE AND SIGNED** in Chambers on this 16th day of September, 2024.

_____
JAMES D. CAIN, JR.
UNITED STATES DISTRICT JUDGE